The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, everybody. Please be seated. We are very happy to be here this morning at the University of Richmond School of Law to hear arguments in three cases. Before I begin, I want to thank Dean Whitney Perdue and her staff for, first of all, for inviting us, and second, for being such gracious hosts. This is a great opportunity for the Court to show aspiring law students what we do, how we do it. And hopefully this will be an enriching experience for you all, and we are going to be taking questions at the end of the arguments, and so any hard questions will go to Chief Judge Gregory, Judge Keenan, and or the law clerk. And because we typically, the way we operate, we get to ask the questions, not the other way around, so we're not used to answering difficult questions. So we'll begin with our first case, 22-4554, United States v. Lambourne. And we've got a murderer's row of lawyers who are going to be arguing this morning. We'll begin with Mr. Wagner. Thank you, Your Honor. Good morning. May it please the Court. My name is Rob Wagner. I represent Mr. Tony Lee in this case. Also arguing today is Mr. Eric Brignac on behalf of Mr. Lambert, Mr. Gerald Zirkin for Mr. Yu, and Lana Moneta for Peter Lee. I'll be addressing the issues of speedy trial violations by the district court, both under the Speedy Trial Act and the Sixth Amendment to the United States Constitution. And if time permits, sentencing concerns, primarily matters of acquitted conduct that resulted in enhancements under guideline USSG 1B1.3C, acquitted conduct. Prior to the trial in this case, Mr. Tony Lee voiced objection after objection to the many continuances ordered by the district court in this case. He waited two and a half years for his trial to be commenced from the first appearance in federal court. His statutory right to a speedy trial under 18 U.S.C. 3161C1 is 70 days. The district court granted one continuance after another, never referencing the Speedy Trial Act's specific requirement for findings that the ends of justice outweigh the best interest of the public and the defendant in a speedy trial. Can I ask you about that, Mr. Wagner? Sure. If the district court, and you may disagree with this, but if the district court actually made the underlying findings that would lead to a result that the ends of justice require the continuance, even if he or she did not utter those magic words, is that enough? And first of all, that happened here, and second, would that be okay? Well, I want to start with the first continuance that was granted in this case, Judge. And this was on the JA 170 to 173, when the district court, upon the appearance of the first defendants in this case, had each of the defendants sign a speedy trial waiver. And then when Mr. Tony Lee came in several months later, he continued his case on the same basis, saying that there was good cause for his continuance on the same basis. Now, under Zedner, this is exactly what the Supreme Court prohibited under the Speedy Trial Act. The case before Zedner was that speedy trial waivers had been signed, and the Supreme Court found that that was not sufficient under the Speedy Trial Act to justify a total of that act. But Mr. Lee did not oppose some later continuances. Isn't that correct, after the trial court denied his motion to dismiss? And how do we factor that in to your argument? Well, again, I think the Speedy Trial Act is very clear on what it requires. And this court, through Smart, Hart, Velazquez, the Supreme Court, through Zedner, and Blow, made very clear that the court, regardless of whether a defendant agrees to the continuance, waives his right to speedy trial, the district court has to put on the record the reasons for that continuance and the balancing interests that the court conducted. But would that impact the issue of prejudice? In other words, if he agreed to some of these continuances, at least after the trial court denied its motion to dismiss, wouldn't that suggest that he did not think he was being prejudiced? Judge, at that point in time, when Mr. Tony Lee was agreeing to continuances, there was a huge dump of discovery. And that's another issue that's come up in this case, the matter of a request by defendants for continuances. There was a huge dump of discovery that was placed on the defendants. And all of them said that they didn't have time to review all of this discovery. So they asked the court for a continuance. I think that was the only situation under which Tony Lee actually agreed to a continuance. But at that point, he had been denied request after request to have his speedy trial rights protected. And in fact, when the judge issued its decision on his speedy trial motion, it did not provide any suggestion that that balancing of interests had been done. I'm sorry to interrupt you, but I want to go back to my original question. You mentioned the waiver, but I think there's more in the record than just a waiver, right? Didn't the district court make factual findings to support, at least in his mind, the granting of the continuances? And I get your point that maybe he didn't link those findings to a legal conclusion that the interest of justice supported not finding a speedy trial violation. But that's the question I'm asking is, does the district court, is it enough to make the findings? If you disagree that the findings were made, let me know. But assuming they were made, is it your contention that the district court then needs to link that finding to a specific legal conclusion that the interest of justice supported denying the motion? My reading of the record, Judge, and I would point the court to Joint Appendix 170 to 173, is that there were absolutely no other findings made other than the waiver of the speedy trial. Now, later on, when objections were made to the continuances and the Speedy Trial Act, rights of Mr. Tony Lee were being asserted by trial counsel. At that point, 83 days had expired from Tony Lee's first appearance in the court until the next continuance was ordered by the court. And I would suggest to the court, I ask you to look carefully at the record. There's nothing on the record that justifies that initial continuance. And so I think that's a very important point. I looked over the record last night, just to be sure, and I saw nothing that's provided under 3161, the Speedy Trial Act, that says that this continuance is proper under the act. Nothing there. So, I point to the court's language, this court's language, in heart and smart. And the court may exclude a period of delay if two things happen. One, if the judge granted such continuance on the basis of the findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. That's one. Can I go back to your statement that there's nothing in the record to support factual findings? But didn't the court say first that the case was complex, right, as defined by the statute? You don't think that's a reason for granting a continuance? Oh, absolutely. That is a reason under the act for granting a continuance. I think you mentioned this earlier, and he explained why the case was complex, but then he also noted, Judge O'Grady, that counsel for the other co-defendants had urged the court to allow more time for them to prepare for trial. Isn't that a reason? I think if it's properly explained, well, I know that the statute requires that the case be so complex and so unusual that it outweighs the interest in a speedy trial. You just said earlier, a moment ago, you said that there was a voluminous amount of written discovery that the defendants needed to sort through. That sounds like it's a pretty complex case. So that was at a different point in the pretrial proceedings, Judge. Initially, Mr. Tony Lee was not concerned about the voluminous amount of discovery that was provided. He wanted his trial. He wanted to go to trial, and he asserted those rights on record. But there came a point, I think it was January of 2022, when the government presented just a whole bunch of new discovery, whole camera evidence, police reports, interviews with witnesses, things that the defendants claimed violated Brady. And those documents were presented to the defendants, and it was only at that point that Tony Lee said he needs more time to prepare for trial. But up until then, the Speedy Trial Act had already been violated. And it had been violated in a way that the district court showed that it really didn't understand its requirements under the law, under the Speedy Trial Act. That allowing for a waiver of speedy trial in the district court's eyes was sufficient for a continuance in the case and didn't toll the speedy trial. But in fact, that wasn't the case, Judge. And I think that that misunderstanding of the law carried through after that first continuance when the district court failed to place the balancing test on the record or ends of justice explanations for those continuances after that point. Are you going to turn to that, the Sixth Amendment? I'd like to, Judge, yes. And so the second point here is that the district court completely failed to address the Sixth Amendment constitutional speedy trial argument of Tony Lee. The issue was briefed for the court. The Speedy Trial Act violation was briefed and decided on by the court. But the court simply missed, I would suggest, the constitutional Sixth Amendment argument. And my request to the court is that there's no other option here but to send it back to the district court for the district court to address that issue if the Speedy Trial Act violation doesn't dismiss the charges altogether. So about that, I get the concern. I think it certainly is legitimate. But I guess we should start with the first question. You said it was briefed, but it seemed to me to be almost an act of thought in the briefing and not really the focus of the record. Do you think it was preserved, the motion? Do you think that the defense in this case did enough to actually bring that issue to the attention of the district court? I would concede, Chief Judge, that the briefing on the issue was not as fulsome as it could have been, but it certainly posed the question to the district court. It was responded to by the government. The government presented their arguments as to why the Sixth Amendment constitutional violation did not occur in that case. And the district court simply failed to address it. There's nothing on the record. And if we agree with you, is there any basis by which we might come to a conclusion about the motion itself without having to send it back to the district court? Again, I think that's outside the purview of this court. There are no factual findings on the record, nothing for you to argue. Aren't there with respect to the Speedy Trial Act? Sure. And is there some overlap there? There's definitely some overlap. But it does not allow this court to decisively come to a decision, a conclusion, on the Constitutional Speedy Trial Sixth Amendment violation. There's simply insufficient information on the record for this court to indulge in that kind of an analysis and that kind of a decision-making process. So our position is it must go back to the district court on that issue. And finally, Judge, I've raised the issue of a sentencing concern in this case. At the time that the district court addressed the sentencing issues in this case, the 1B1.13c, United States Sentencing Guideline Provision, was not in place. And so the district court certainly could consider acquitted conduct. And the acquitted conduct here is very significant. The firebombing charges brought against Tony Lee were acquitted, where the jury found him not guilty on those charges. Yet, the district court relied on those charges in enhancing Mr. Lee's guidelines. And this court is in a position to look at that, to decide whether or not an injustice was done to Tony Lee, and send it back to the district court so the district court can consider that particular case. Do you have a case that supports that as a standard? I mean, it seems like the law was the law at the time. And you're asking the court to say, notwithstanding that, there's been a change in the law which we should apply retroactively. But there's no basis for doing it, no legal basis for doing that. Is there? I see my time has expired, and I answered your question. This court has provided a tremendous amount of information. You just told me earlier we didn't have a lot of discretion with respect to this case. Well, in terms of a sentencing issue, I think the calculus is different, Judge. Right, but the precedent was pretty clear at the time, wasn't it? Oh, no question. No question that it was. But now we're in a position where I believe under several different factors we have here, the case should be remanded to the district court. And if the court is to do that, then I would suggest that you do that on the sentencing issue as well. Are you making it as if it's a remand request based on compassionate reasons? Because you concede that the district court at the time could enhance on acquitted conduct, correct? Yes, exactly. Certainly, in response to the Chief's question, is there any precedent for that, that we can do that? Only 26 U.S.C. 2106, which allows this court to take whatever action it feels appropriate, as may be just under the circumstances. And I would suggest that this issue is absolutely just under the circumstances. Thank you very much, Mr. Wake. Thank you. Thank you, Your Honors. Eric Brignac for Mr. Lambourne. I'm going to speak about the district court's denial of his motion for new counsel. And obviously with such a short time, I very much welcome the court's questions on this. When Joseph Lambourne claimed that he'd asked his counsel to file a motion for a new attorney three months ago, and they had not done it, the district court did nothing. It didn't even ask the lawyers who were standing right there, hey, is that true? Did that happen? No, he just said, stop. I don't want to hear it. And that wasn't any sort of adequate inquiry. It wasn't any inquiry at all. And if he had conducted the proper inquiry, he would have found a communication breakdown. We know this because Mr. Lambourne had such a breakdown of communication with his counsel that he ended up almost hitting one of them during trial and ended up having to go pro se, which very much prejudiced him. I mean, he didn't have any opportunity to have a good closing argument or to have good cross-examination of the most important witnesses against him. And this isn't a case where he was trying to get to lay. He wasn't a sovereign citizen who was causing all sorts of problems. This was his first attempt at trying to get a new lawyer. Can I ask, so obviously you've done this a long time, and client satisfaction can sometimes be an issue with defendants who think that lawyers aren't looking out for their best interest, even if they might be. It seemed to me that the principal problem in this case with respect to the relationship, at least early on, was the fact that the lawyers weren't visiting the defendant enough, at least frequently enough, to satisfy him. That seemed to be one of the concerns. And so my question is, when a lawyer, separate and apart from the district court's failure to follow up on this issue when presented in court, when a lawyer is presented with a client who wants the client to file a motion for the lawyer to withdraw, is the lawyer obligated to file that motion right then and there, or is the lawyer's obligation to consult with the client to see if that relationship can be repaired? I don't think the lawyer has an ethical obligation to file it immediately. I take your honors point. The lawyer, though, at that point, has an obligation to follow up. And one thing Mr. Lamborn said, he specifically said, you know, I continue to ask to have Mr. Yamamoto taken off my case. And the district court actually got that wrong. The district court ended up saying, you know, and you basically said you were satisfied. And that was, you know, when they were having this sort of final policy with the court, he said, joint appendix 735, I told him I wanted 100 percent, put in a motion to get Mr. Yamamoto off my case because of this. And so what we know is that even if your honor is correct, that they didn't have an obligation to go run to CMECF and file something immediately, this was an ongoing problem for three months. And if you take that timeline, if you take that three months and go back and said, had the lawyers filed this at the time, when was that? The trial hadn't been calendared. The district court was still dealing with pretrial motions about severance. This is a joint appendix 84 and 85. That's a docket sheet. So that would have been adequate and plenty of time for this to happen. Okay, well, let's assume that that was an error on the part of the district court. Is that error subject to harmless error analysis? And isn't the best evidence of that the performance of the lawyers at the trial? No, your honor, I wouldn't say that's the best evidence. It is harmless, but I would say the difference between harmless error and plain error or harmless error and us having to have that burden is the government has the burden to show that the error was harmless. And when you have a situation where, again, as he alleged, I only saw 1% of my discovery, joint appendix 731. Joint appendix 730, my attorneys gave me discovery, and they said, you know what, we're going to make it easy on you. We're going to mark the parts of this voluminous discovery that you're in. And Mr. Lamborn started looking and saw parts of the discovery he wasn't in. Again, the level of trust. There's two questions, your honor, I think that are important. You have one where you say, okay, I want a new attorney because my attorney is being ineffective. And you say, I want a new attorney because we have a fundamental communication breakdown. And your honors know better than anyone that you sometimes ask a question and the counsel ends up giving you an answer to the much easier question. The district judge here answered the easier question. Mr. Yamamoto is an experienced attorney, and I've looked at his timesheets, and he's doing a great job. That wasn't the relevant question. The relevant question was the communication breakdown, and if I may just quote Judge Davis from the Smith case, only when a defendant is heard by counsel can a defendant be heard through counsel. That didn't happen here. It was a violation of the Sixth Amendment. Mr. Lamborn, you said you tried. One of the bases, though, of his complaint thing that relate to ineffectiveness, like he hadn't seen me enough, not listening to me, as opposed to the type where we're just fundamentally, I want to go north and he wants to go south. And I don't think those kind of things. Because I guess the judge is saying, whatever that was, it's cured because this counsel is effective. Isn't that different than you said? I know what you're saying, because sometimes I don't care. You could be the best lawyer in the world, but I just can't stand you. I don't want to talk to you. I think you're working for the federal government, not me, those kind of things. Lawyers know that when you get to the point where there's just no trust. But then they really deal with things, their effectiveness, like you haven't seen me enough to have time to be effective. And the court says, no, this is a good lawyer, and he's effective. Do you understand what I'm saying? I do, and if I may answer. So I think, Your Honor, that the response to that is, first, it's important that he said not just, again, he's not a sovereign citizen. He's not here saying, I hate all attorneys. I've met clients, and the first thing they said to me is, oh, you're a public defender. Follow the money. You're working for the government. Okay, this wasn't that situation. Mr. Lamborn, when he says, I had to resort to communicating through non-incarcerated family members. You know, my sister had to get this message to them. And then they did nothing in response to it. And as soon as he got back to court, the first time he physically was in court, he explained this to the judge. This, Your Honor, respectfully, isn't just, oh, I hate appointed lawyers, or I hate all lawyers. I mean, this was someone saying, I'm having this communication breakdown, and what little we have in the record, because there was no, God, I can't say that word. There was no follow-up by the district court. You know, what do we have in the record? We have the fact that he had to communicate through his sister. The lawyers did nothing, and it wouldn't have been hard. I'm not saying we had to have a two-week hearing on whether he needed a new lawyer. But the judge didn't even look over at Mr. Yamamoto and say, is that true? What happened there? Does the record provide us any basis for finding that there was prejudice as a result of that? And does the issue of prejudice matter in this context? Well, I think, Your Honor, it is a harmless error standard. So I think prejudice does matter, although I would emphasize we don't have the burden. But I think when you're having a jury trial, and again, regardless of whether from the outside perspective these lawyers were looking effective, whether they seemed effective, when the communication breakdown is such that Mr. Lamborn says, you know, I want to hit my attorney, I almost hit my attorney, the record I think was a little unclear as to whether the jury even saw that or what happened. That's crazy. And then he had to go pro se, and this poor guy, I mean, he's telling the judge, I don't need any continuance. I'm going to flip through discovery as I'm cross-examining these witnesses. This wasn't a guy trying to throw a monkey wrench into the system. This was a guy who wanted a lawyer. And where was that prejudice? The prejudice was that he didn't get the lawyer. He had, as the government said, Joint Appendix 3567, you know, it was the most important witnesses regarding Mr. Lamborn were at the end of the trial. And those were the ones he had to cross-examine himself with no training, and those were the ones that he ended up doing his closing argument, which, Your Honors, I'm sure have read, was a bit of a train wreck. And so I think there's your prejudice, or certainly at a minimum, that means the government can't meet its burden of showing that the error was harmless. And I know it would be a big deal to, you know, create a whole business with a two-week trial and give Mr. Lamborn a new trial is a huge deal, but it's a bigger deal to have denied him counsel. And so I would ask this court to vacate his conviction and remand for a new trial. You want to try inquiry one more time? No, Your Honor. This is being recorded, right? Thank you. Thank you very much. Mr. Zirkin? Good morning, Your Honors. If nothing else, I guess, happens today, we at least have discovered Mr. Brunier's Achilles heel. Gerald Zirkin representing young you. Your Honors, we raise the insufficiency of the evidence, S accounts 3, 4, 5, and 7, and the fact that the court erred in denying Mr. Yu's Rule 29 motion. Going to the kidnapping first, Your Honors, there's no evidence that Mr. Yu instigated or planned the embegglement of Mr. White or his seizure. It wasn't his plan. He had no part. There's no evidence that he had a part in causing that to come about. It was instigated by Fahad and Safe. Mr. Yu expressed great surprise when Mr. White arrived at Lowman's Plaza. That's at Joint Appendage 3103. Mr. Yu did not ride in the car with Mr. White coming to Richmond. Mr. Yu did not get Mr. White out of the car when they were in Richmond. The most that can be said is that Mr. Yu followed after the two other defendants who escorted Mr. White from the car to the woods and either caught up with them before they entered the woods or after, but ultimately, whichever it is, it doesn't really matter. There was no evidence that Mr. Yu did anything to restrain Mr. White when they were in the woods. And we know very little about what happened in the woods. What about Richard Pack's testimony and his testimony that Yu stabbed White before Lambourne shot him? And you're making essentially a credibility argument there, but we're not in a position to resolve a credibility issue. I understand that, Your Honor, but as to the kidnapping, it doesn't change the kidnapping equation. It's an assault. I'll discuss it in the context of the bike car murder in a moment, but I don't think that that involves restraint. So I don't think there's any evidence that when they were in the woods, he did anything to restrain him. You do have to restrain somebody before you can stab them, don't you, or they can do something different? I don't know that that's necessarily true. That's speculation as to how it occurred. He took the knife and he stabbed. You could stab somebody just standing there in front of them. You don't have to restrain them to do it, and we don't know what happened once they were in there. Your Honor, I would turn to the bike car murder. Mr. White was killed by gunshots. The only evidence was that Peter Lee shot him, not that Mr. Yu did. There was evidence that, as Your Honor mentioned, that Mr. Yu stabbed Mr. White, but that did not produce fatal injury, and there was no evidence that he intended to kill Mr. White by doing that. The government must prove that Mr. Yu aided in abetting the actual killing of Mr. White, which was by the other two who were in the woods with him. It requires proof that he shared the specific intent to murder Mr. White. Both Fahad and Kevin Ageson, a gang member who was present both at Lowman's Plaza and Road to Richmond, thought that White was just going to be beaten up or jumped. The testimony of the government's own witness was that Mr. Yu did not want to go on missions. He didn't want to live a gangster life, that he discouraged violence among gang members, and he wanted to pay Mr. White for his injuries, not that he wanted to kill him. Mr. Zirkin, can I go back to the kidnapping? Yes, Your Honor. Just briefly. So this was a conspiracy, right, a kidnapping charge? There is a conspiracy. Underlying conspiracy. And there's also kidnapping resulting in death. Okay. So with respect to the—are you saying that these are two separate offenses and therefore you can't consider the fact that the conspiracy charge is relevant to whether or not your client should have been convicted of kidnapping? No, you can consider it. I'm not saying that at all. I'm just saying that there—I would suggest that there is an evidence to support the fact that he did anything to set up the kidnapping, to pull off the kidnapping. But if he's a member of the conspiracy, isn't he in for a dime, in for a dollar? Well, I would dispute that he's involved in the conspiracy. He is at Lowman's Plaza. He expressed a surprise, I would suggest, when White shows up. So he's not at that point been planning it. He's not part of the conspiracy at that point. He rides down in a separate car. They come to Richmond. This doesn't make him part of the conspiracy at that point. Mere presence, which is what he is in the other vehicle as they come to Richmond, mere presence is not enough to make these a conspiracy or the substantive charge. All right. Thank you very much. Thank you. Good morning, Warreners. May it please the court, counsel. Lana Moneda on behalf of Appellant Peter Lee. I'll be addressing issues number one and number five in the jointly filed appellant's brief, number one being the denial of appellant's last motion or last motions for a continuance, and number five being the sufficiency of the evidence against Peter Lee on counts three, four, five, and seven and the denial of his Rule 29. Firstly, we submit to the court that the denial of the joint motion for a continuance in the face of a late disclosed 632 gigabyte discovery disclosure for which the index alone was 30 pages in length was precisely what the Williams case speaks against, which is a denial of a continuance based on an arbitrary insistence on expeditiousness. Now, the government in its brief in opposition mentions, and the court has touched on it this morning as a co-appellant, that there had been past continuances in this case, a number of them. But past delays had been due to COVID and other late and large disclosures of discovery. This final request that we're discussing was made after counsel had already indicated earlier on that we needed more time, and we were given originally only two more weeks to go over this discovery, and it was not enough. It could not be completed, and this effectively denied Mr. Peter Lee, a competent counsel, at the most crucial stage, the trial. I mean, the timing of this is relevant, I think, and the district court's concern, or not concern, but its reason for not willing to grant another continuance, is that the lawyers were not new to the case. They had an understanding of the facts. They'd gone through a good bit of discovery, and admittedly, this was a lot more, but it wasn't something that was in isolation. It was something that the district court felt, at this point, that the defense could deal with adequately. I mean, that's a reason, right, for denying the continuance, and isn't that enough to, how can we say that that was an abuse of discretion? Well, it's a reason, but it was the reason that the government gave, and with all due respect to the district court, there was no way for the district court to know whether that was actually true, unless we could look at all of the discovery, and determine what was in there, and whether it was helpful or harmful, or something we hadn't seen before, and 632 gigabytes is a lot of discovery, so this district court seemed to... Being in the discovery that you were surprised by, and would have changed the result of the trial, isn't it your burden to show that the result would have been different? Well, and my time is up, if I may answer the question. I mean, the final version of the forensic anthropologist report, I believe, was in this last dump, and this is only one example. The fact that we don't know, and did not get eyes on everything in those 632 gigabytes, is really the heart of the prejudice argument, because an unprepared attorney is, per se, prejudicial to a criminal defendant, as far as submission, but the one example that we know about is that the final version of the forensic anthropologist report was in there. There was not time to go through not only what this meant for the defense, but go through the practical process as a CJA attorney of justifying the funding for a forensic anthropologist. It can't be theoretical. We have to go get the approval. We have to get the author. We have to find somebody who's willing to do it. So it's not a matter of just making a phone call when we see a report in the discovery. And for Peter Lee specifically, that report, for the first time in the case, really, gave an indication of a third weapon. And that's a big deal when three defendants go in, and there's two types of injury, knife and gun, and heretofore it seemed that there had only been two weapons. So for Peter Lee specifically, that one issue was potentially groundbreaking and case-changing, and there may have been other issues that we were not aware of. Unless the court has other questions, I'm all over my time. Thank you very much. We'll hear from the government. Good morning, and may it please the court. Jacqueline Bechara for the United States. With me at council table is Mr. James Trump, the lead assistant U.S. attorney on this case at trial. Unless the court has a different preference this morning, I'm going to address my friends' arguments in the order that we heard them. So that means that I'm going to start first with Tony Lee's claims after the Speedy Trial Act and the Sixth Amendment. So Chief Judge Giaz, I think you're correct that it is sufficient that the district court, at the time of each hearing where it found that it needed to continue the trial date, substantively engaged with the proper considerations for granting an ends of justice continuance, even if it didn't necessarily use the magic word ends of justice. And it's important that those considerations match on to the justifications that the district court asserted in its ultimate order denying the Speedy Trial the motion to dismiss. Judge Keenan, you asked about Tony Lee's failure to challenge the period of delay that postdated the denial of his motion. And I just wanted to clarify sort of what our thinking is behind why that failure matters. It flows directly from 3162A2, which is the remedy provision under the Speedy Trial Act. First of all, it places the burden on the defendant to identify the period of delay that he thinks did not comply with the statute. And second, it's an express waiver provision, right? It's not a forfeiture. Failure to move to dismiss waives that claim. And I think my friend said, at least in the reply brief, that this would be kind of an unworkable proposition to have defendants just renewing motions to dismiss. I want to be very clear. We're not saying that he had to just keep telling the district court, I think that continuance that you granted two years ago was improper. The point was that he needed to notify the district court that the continuances that the district court had not already addressed in its order denying the motion to dismiss were improper for some reason under the statute. So Mr. Wagner says that the district court in this case wasn't really focused on the facts, the record facts that might support granting a continuance, but was instead focused, at least initially, on the fact that the defendants had waived their speedy trial rights. So can you talk to that? Right. I don't think the record really bears that out. This is not a case like Zegner or Henry where the district court said, okay, we've got these waivers on the books and so that's good enough. Instead, if we go through each of the hearings, there was a September 2019 arraignment. The court said this fits squarely within the complex case exception, which is a specific reference to 3161A7B2. At the February 14th 2020 status conference, again, the court reiterated substantive concerns about the number of defendants, continuing investigation, the potential for additional charges that are coming down the pipe. At the September 1st 2020 arraignment, again, the district court said that it was concerned about counsel's ability to prepare and right now they're in the middle of COVID. There was difficulty because of the restrictions of the jails. Counsel had difficulty accessing their clients and reviewing the discovery that had been provided with their clients. Again, at the April 13th 2021 status call, the court reiterated the limited amount of time that counsel had to prepare and to confer with their clients. The record makes clear that the district court had more in its mind than simply some waivers that had been executed two or three years prior. Can I ask you about the Sixth Amendment issue, which I'm a little troubled by? I asked Mr. Wagner first whether it was sufficiently reserved. I didn't use those words, but it didn't seem to be the focus of the briefing. You haven't argued waiver, right, or forfeiture. We haven't argued that simply because, I mean, he does say Sixth Amendment in his motion and as my friend pointed out, the government did substantively engage with the Sixth Amendment analysis in our response in opposition, so I want to acknowledge that. Right, but the district court didn't. Yeah, I mean, the better practice... Sorry. What I said was you engaged, but it doesn't appear the district court did, and so you're asking us, I think, that we should do that in the first instance, and I have to say I don't think we found a case that ever resulted in a circuit court for the first time conducting a Sixth Amendment speedy trial analysis. And I haven't found a case like that either, Your Honor. Certainly the better practice would have been for the district court to specifically address that claim. I don't think that a remand is necessary, first and foremost, because my friend has never said what additional fact findings we need. As I think you acknowledged during his argument, the district court's analysis of the statutory claim essentially covers the same facts that are at issue in resolving the Sixth Amendment claim, and in his reply brief and then today, he has not argued on the merits of any of the Barker factors or said that they would shake out differently if we sent this back for the district court to do something new. And that makes sense because this court has repeatedly recognized, I think as recently as Per, the court said that the constitutional and the statutory claims operate in tandem, and we know that because Congress enacted the statutory right to codify essentially the Sixth Amendment right, and the Speedy Trial Act is a bit more rigorous than the Sixth Amendment analysis. So if a defendant cannot make out a claim under the statute, I think it would be— The Speedy Trial Act is more important than the Sixth Amendment? No. Did you say that? I think I said more rigorous just because there are those particular periods of delay. But it's not more important, is it? No, Your Honor. The court needs to address that. The district court— I agree with you. They put those 10 things in there for a reason. We hope they still mean, you know, right? Yes. All I was getting at was that I think it's a little bit more procedurally rigorous, the statute, rather than the Sixth Amendment. I agree with you. They're equally important. It would have been a better practice for the district court to address the constitutional claim here, but I submit that a remand is not necessary because the court has all of the facts necessary to resolve the claim. And ultimately, whether there's been a constitutional violation is a question of law that this court would review de novo. Unless the court has other questions about the speedy trial claims, Tony Lace Counsel also touched briefly on the sentencing issues, specifically the district court's consideration of acquitted conduct. As we laid out in our brief, the district court made alternative findings for the application of each of these enhancements, which makes clear that its calculation of the guidelines range did not necessarily depend on the consideration of acquitted conduct. Chief Judge Diaz, you're correct that at the time of sentencing, it was perfectly proper for the district court to consider acquitted conduct because the amendment removing that from the scope of 1B1.3 didn't take effect until over a year or so later. And I don't know of authority for the court to just kind of send it back, especially when there are other proper findings supporting each enhancement. You said it was proper. Was the district court required to consider that? Required to consider acquitted conduct? Right. I think it was in the court's discretion to consider that. Well, I suppose absent a request by the government, I don't know if the district court could have reached out and done it on its own, but assume that this happened here, I guess someone made a request that acquitted conduct be considered. Could the district court have said, you know what, the record supports a finding by a preponderance that the defendant may have committed these acts, but as a matter of discretion, I'm declining to do that. Would that have been error? I don't know that the government would have appealed that kind of finding. Well, that's not... I know that's not your question, Your Honor. I can't think of a case that's in that posture, so I don't think it was the error. I mean, as long as the district court kind of engages and makes this actual finding, it's up to the district court what it actually, what it ultimately considers in fashioning the sentence. Well, why would the court have to consider acquitted conduct? I thought the whole line of cases that we've seen in the Supreme Court have said the district court may consider until the sentencing commission changed the rules. Right, that's correct. But why would the court have to consider it? Again, I think it's a matter of discretion. It's defined by a preponderance of the evidence that the facts have established. Here's the fire bombings. Of course, there are also 10 uncharged fire bombings which the district court also considered. And if the court were to send this back, the court, even under the new 1B1.3, could still consider the uncharged fire bombings, which outnumbered the acquitted fire bombings. I guess your response would also be that then even if the district court could decline to consider acquitted conduct, it would be the defendant's burden to show abusive discretion in failing to discount acquitted conduct. I think that's correct, Your Honor. I can move next to Mr. Lamborn's request for new counsel. I want to start out by kind of clarifying where the record stood when the district court made its decision. My friend suggested that the district court failed to actually confirm with defense counsel the verity of the defendant's claim. But if we look at the first statement during the hearing, it is from Lamborn's attorney, Mr. Brodnack, who told the district court, Mr. Lamborn had, in previous occasions, intimated that he was not happy with our services and requested on Friday of last week very definitively that we ask to withdraw. And then the district court turns to Mr. Lamborn and asks him to explain his concerns with his counsel. And Mr. Lamborn says that what he said, referring to Mr. Brodnack, what he said was true earlier. I asked last Friday for this motion, but I actually asked three months before when I was in Northern Neck. And then he goes on and describes this exchange between Mr. Brodnack and Mr. Lamborn's sister, in which Mr. Lamborn says that he told his sister to ask his attorneys to withdraw. And then Mr. Brodnack started visiting him, but Mr. Lamborn, I guess, was not satisfied with the amount of discovery that they were going over. Mr. Brodnack told him the most important discovery is coming 40 days before trial. And this is important. So Mr. Lamborn, in his colloquy with the district court, So I said, okay. But I still wanted, as my colleague alluded to, I told him I wanted 100% put in a motion to get Mr. Yamamoto off of my case. So then, based on his attorney's statement and then Mr. Lamborn's statement, the district court found that Mr. Lamborn made conflicting statements about when he asked his attorneys to withdraw and then the fact that he actually decided to wait after initially suggesting that they withdraw. So on that record, I don't think you can say that the district court clearly erred in finding that the motion that was filed six days before trial was untimely. If we disagree with you, I guess the question is what do we do about it in the context of the record? And your position, I suppose, is that the record is the best evidence of the lack of any harm or prejudice to the defendant. I agree with you. Before we turn to the harmlessness, if I could just make the point that the district court actually found that there was no attorney-client conflict and no lack of communication. And those were the primary reasons why the district court denied the motion. This court has recognized in cases like Smith that if there's a meritorious claim, even a lack of timeliness is not going to defeat that. So I think even if Mr. Lamborn had filed his motion three months before trial when he says that he wanted to, it still would not have been an abusive discretion for the district court to deny the motion based on the record in which it found that there was no breakdown in the attorney-client relationship. That's the essence of the request for new counsel. That's why the inquiry is driving at the court, or I'm sorry, the defendant's concerns, what is the nature of the relationship that exists at the time. Did the lawyer say that there was no breakdown? Did the lawyer say there was no breakdown? His lawyer. Did the lawyer say there was no breakdown? That was the best evidence, isn't it? The lawyer did not say that. The district court did not ask that question, but the district court made a finding. Make the finding, but you didn't ask the question. You're saying it should be sanguine that there was no conflict. Well, the lawyer didn't say that. The lawyer didn't say, oh, no, we did a long find. What contradicted in the record that there is a breakdown? If I could point you to three points in the colloquy that suggest that they were continuing to communicate, I think that's probably the best evidence in the record. First, so first off, Mr. Brodnag confirmed, so Mr. Lamborn brought up his concerns that these problematic statements that he made after the reverse proffer, he was worried that those would come in as evidence against him at trial, and the district court specifically addressed Mr. Lamborn's attorney who confirmed that he had spoken with Mr. Trump who confirmed that those post-proffer statements were not going to come in at trial. So clearly that shows that Mr. Lamborn was talking to his attorney about this concern about the evidence that was going to come in against him. Second, when Mr. Lamborn said one of the things that he wanted to be able to do was to subpoena the deputy of the jail to support his possible alibi defense, again, the district court turned to defense counsel and said, has he asked you about this? And the district court confirmed that Mr. Lamborn had told at least Mr. Brodnag about this possible subpoenaing of the deputy of the jail. And then third... So that's the end of that? You're admitting that you did ask about supporting an alibi, and the court said that was fine? How was that resolved? How was it resolved when that was brought up as part of the reason for his being dissatisfied? I mean, you're saying that the court all said there's nothing here, nothing there. How was that resolved? Because you have a person standing there before the court and a lawyer, and he's saying there's a problem. You said all this is resolved. Didn't he say he went almost a year or something and didn't... Am I wrong about that? Hell of a lot. I mean, weren't there several things he was complaining about over time in terms of discovery? Yes. Those kind of things. How did the court just resolve this by standing up there and saying, no, you're wrong? And how was that resolved? Okay. Factually. Fact. It was a fact inquiry, because, you know, Sixth Amendment right to counsel, I mean, people just ignore it. I mean, it's even in the Constitution. I mean, the framers said that was important, effective counsel, and it was resolved just because, well, no, I think the lawyer's good. The delay was fine. The alibi was that. And you're saying they just pass on and then go to the next one. Is that the way we should adjudicate these cases at the appellate level? I don't think so, Your Honor. The point I was trying to make was just that it was clear that Mr. Lamborn was telling his attorneys what he wanted them to do. But to address your question about kind of how the district court unpacked the complaints that Mr. Lamborn raised, the district court heard him out for several pages of transcripts and then said, I hear you, but these are the same concerns that all defendants are experiencing right now. A lot of the problems in terms of the insufficiently frequent visits and maybe lack of reviewing enough discovery stemmed from the COVID-19 protocols at the jails, which uniformly restricted counsel's access to their clients. There was also the fact that most of the discovery produced in this case was subject to a protective order because of the nature of the charges here. And so counsel could not simply leave the discovery with his client. And those are what the district court substantively engaged with and found. Basically, these are concerns about lack of access, but there is no breakdown in the attorney-client relationship, no breakdown in communication, no kind of intractable conflict that would prevent an adequate defense. Chief Judge Fievre, I do agree, though, that if the court is maybe iffy on the timeliness finding, you could still say that any error here was harmless given the adequate assistance that his counsel rendered through the majority of the trial. And so my friend, I think he said in his reply that he's not raising some challenge to the effectiveness of Lamborn's performance after he decided to go pro se. He's also not challenging the threat of colloquy, I don't think. And so if you look at cases like Horton, that involved a similar fact pattern where the defendant before trial had moved for new counsel, the district court denied that motion, the defendant went to trial, he was convicted, and sometime after trial but before sentencing, the relationship really did break down and he had to replace his counsel. And the court said, be that as it may, that doesn't show that any error in denying the motion at the time was harmful. And I think the same bears out here. There was three weeks that elapsed between that hearing on his motion and then the 12th day of trial when he decided to go pro se. And so that doesn't, you know, the fact that over the course of trial, I'm sure that hearing all of the witness testimony, trial can be taxing for everyone involved, that the relationship subsequently did break down doesn't mean that any error in denying the pretrial motion was harmful. So before you turn to the next issues, you're suggesting that we should sort of cabin the analysis and not look at what happened near the end of the trial where, as you point out, the dissatisfaction became clear. In fact, so clear that there's evidence that the defendant attempted to assault his lawyer that's pretty good evidence that he was unhappy. I agree with you. And I think it's clear that the relationship did break down by the 12th day of trial. I would just submit that that doesn't mean that the district court abused its discretion or that any error harmed the defendant at the time that the district court made its ruling based on what it was hearing from the defendant and his ability to communicate with his counsel. The next issue, Mr. Yu challenged the sufficiency of the evidence. Just given the time that I have, unless the court has specific questions as to sufficiency, we could rest on our briefs so that I can move on to the next issue. So about that, Mr. Zirkin talked about the things that his client could not do with respect to the kidnapping offense, the things that he wasn't involved in. But is that the analysis or is it the sort of the overall nature of the conspiracy to commit the offense? So if you view the evidence in the light most favorable to the government, I think there was overwhelming evidence that you participated in the conspiracy and the kidnapping. From the outset, you threatened Mr. White and started to put a bounty on his head. Other members of the gang knew about the debt and offered to help locate him for Mr. Yu. You actually, when Mr. Nguyen was in the car with White and this was all unfolding, he called Yu to kind of give him the approval to assault Mr. White. And then Yu was the one who was paying for Nguyen's attorney and then he was kind of, Nguyen's attorney was keeping Mr. Yu involved about the status of the state case. And then if we turn closer to the actual kidnapping, so there was testimony that Song Park heard Mr. Yu and Mr. Lamborn talking about going on a mission. This was on the night of January 31st, 2019, the night of the kidnapping. Before they left for Peter's apartment, Peter's apartment is where everyone met up. And at Peter's apartment, Peter and Yu told Ageson and Carlisle that Fahad was going to set up Brandon White because he owed Mr. Yu money. So Mr. Peterly and Mr. Yu described this plan where they were going to drive these two cars and meet up at Women's Plaza near the McDonald's. Then there's surveillance footage showing the two cars that are parked directly adjacent to each other and Yu is standing there kind of as they wrestle Mr. White into the cars and then they drove down to Richmond together and when they lost sight of the other car that had Mr. White in it, Yu told Fahad to call Peter so that they could meet up. So all of that goes to show that they were operating in tandem throughout and Yu certainly was a willing participant in the kidnapping conspiracy. The final issue raised by Peterly was regarding the district court's denial of the additional continuance in the four days before trial. The defendant needs to show that the denial was unreasoning and arbitrary. On this record, I would submit that it's not. Chief Judge Diaz, you acknowledged in my friend's argument that the lawyers were not new to the case. They had been assigned for working on it at least two years at that point. As the district court observed, these were veteran lawyers in our district who regularly handled these complex racketeering and murder cases. I also just wanted to highlight that the government had been producing discovery on an ongoing basis. My friend characterized the discovery as being late. That's not correct. The district court never found that we violated any rule or any order or any of our discovery obligations. We complied with all of them and there was also no finding of any kind of bad faith on the part of the government. I understood counsel's argument to be and all of that, I think of what you said, it's true that they were veteran lawyers. The government complied with the scheduling order but that the amount of new discovery that came in right under the wire, it was just unreasonable for the district court to conclude that these veteran lawyers could get through all of it in time to adequately prepare for trial. Right, so when the new discovery was produced in February, that's when the district court actually granted an additional continuance after engaging with the coordinating discovery attorney which this court specifically authorized to help the defendants process and be able to search through all of the discovery. After hearing from the coordinating discovery attorney, the district court gathered more information about how long it would take for that attorney to process the new material in a format that would be searchable for defense counsel and she projected that it would take her three weeks so that's why the district court gave defense counsel the additional two weeks in which to review the additional discovery. It was searchable across file types which is critical because that way they could just type in a word or a name and find information specific to a particular witness or area of testimony. So the defendants actually started receiving discovery as far back as August 2019. They had the assistance of the coordinating discovery attorney by September of 2020 and then the defense counsel received the bulk of the discovery in this case by December of 2020. I also just want to remind the court that there were seven attorneys on the defense team in addition to the coordinating discovery attorney who were preparing for trial. There were actually nine defense attorneys at the time of the February 2022 production. There were two defendants who pleaded guilty very close to trial. So it was a fairly robust team of lawyers who were reviewing the material and preparing for the case. And one concern that we haven't talked about but it was relevant to the district court's balancing and whether the court abused its discretion were the justifiable concerns for the safety of our witnesses. That's something that the district court specifically expressed as a reason in its order denying an additional continuance that the substantively valid concern this court has recognized in cases like Fuller and unfortunately that concern materialized on the very first day of trial when Tony Lee called his associate from the jail and had them post on Instagram watch the snitches snitching this week and share the government's first day witnesses. The district court had to balance once the information about the cooperating witnesses sort of the cap was out of the bag the district court had to balance the defendant's amount of time that they had already had to prepare for trial against the concerns of putting our witnesses at risk by having this information lingering out there. But ultimately even if this court were inclined to conclude that the district court abused its discretion the defendants have failed to show any specific prejudice. I think the one point that my friend focused on was on the forensic anthropologist's report but at trial Peter Lee's counsel cross-examined her extensively and actually identified a discrepancy between the forensic anthropologist's testimony regarding the number of gunshot wounds and what was reflected in the report. And as we noted in our brief I mean there was simply overwhelming evidence of Mr. White's injuries. I don't think anyone disputed that he was killed that he died and ultimately it was not the forensic anthropologist's province to render an opinion on the cause of death and that only the medical examiner who was a medical doctor could do that and that I mean the defendant has never challenged sort of his ability to engage and cross-examine the medical examiner. Unless the court has further questions. Thank you very much. We ask that you affirm. Thank you. Mr. Wagner. Thank you, Your Honor. And may it please the court. Judge, turning to the initial continuance that you've been discussing during this argument and I point the court again to the transcript of the trial. The district court was much more concerned with the calendar and the schedules of the court and of counsel, much more concerned with getting waivers from each of the defendants rather than setting forth any justification for the continuance under the Speedy Trial Act and at 172, you see the judge colloquy, Trial Defendant 172, you see the judge colloquy each of the defendants in court asking if they waive their right to the Speedy Trial and you see there also that the only justification given and this is at line six, because of the need to prepare for trial and also their own calendars and the court's calendar. And so there you see no justification for this being a complex case. You see no justification for there being an abundance of discovery in this case, merely a waiver of Speedy Trial and you go to page 273 of the Joint Appendix and that's when Tony Lee is first brought in and basically the judge relies on the same justification for the other defendants in continuing Tony Lee's case at that point for 83 days. Turning, and I would quote from Zedner, in Zedner the Supreme Court specifically stated a straightforward reading of these provisions, the provisions of the Speedy Trial Act leads to the conclusion that if a judge fails to make the requisite findings regarding the need for an ends of justice continuance, the delay resulting from the continuance must be counted and if as a result the trial does not begin on time, the indictment or information must be dismissed. Turning to the Sixth Amendment constitutional issue, I just want to make clear that counsel for Mr. Tony Lee at trial identified the prejudice by denying that constitutional challenge was the ability to identify, locate and interview witnesses so there was a prejudice prong that was provided by counsel to the court. Was that a generic statement? Did he identify particular, was that, I mean did he identify particular witnesses? He did not. That's not enough then I don't think. Well, I would suggest that it satisfies the prejudice prong at least to the extent that the district court should have been compelled to issue an opinion on that and to provide some answer to the question. Well, I think the opinion would have been that's not enough. That would be speculation and the district court had lived this case for a number of years at that point and had context as to what was going on with all of the witnesses in the case, all of the counsel in the case, all of the defendants in the case. All right, thank you sir. And finally, if I could. Very briefly. Under 1B.1.3 of the guidelines as far as acquitted conduct is concerned, the changes in the sentencing law between the sentencing of this case and the appeal here, I would say provides justification for this court to remand the case back. It's a compelling circumstance to remand this case back to the district court for recess. Thank you very much. Thank you. You had asked Judge Diaz and the government pointed out about lawyers have to file this motion as soon as he told them. The Mullen case is very important. We talk about it in our briefs. It shows there it was not the defendant's fault. The timeliness review is for the defendant's fault. There, it was the fault of the court for not calendaring it, wasn't held against him. So first step, it was timely. The adequacy of the district court looking into it, as you pointed out, Judge Gregory, he didn't even ask was there a breakdown in communication? Maybe an analogy to Matthews v. Eldredge, what level? The district court did nothing. And so the question of what would have been adequate enough, we don't really get to because whatever it did certainly wasn't enough. I also want to point the court to Joint Appendix 3238 when we're talking about what he could have done. He's talking to the court. I did not know that I could write to you about these issues. I had no knowledge of that. I have told my lawyer, who is the one I'm thinking is the one who controls these things and these motions. Yeah, that was right for him to think of that. And my red light's already on. So if I may just conclude, these lawyers were not advocating for Mr. Lamborn. They were managing Mr. Lamborn. And as a defense lawyer, I can't stand for that. And I don't think this court should either. Thank you very much. Thank you. Your Honors, counsel, I believe, mentioned the fact that other members of this group made offers to take care of Mr. White for Mr. Yu. But Mr. Yu didn't take them up on any of those offers. All of that actually goes to the fact that he wasn't interested in killing Mr. White. He never indicated he was interested in killing Mr. White. And nothing indicated that Mr. Yu knew that Peter Lee's or Mr. Lamborn's intent was to kill White before they went into the woods, nor that he became aware of that intent while in the woods before they shot him. We don't even know when they formed that intent. For all we know, something happened in the woods that caused one of them to decide to kill White rather than simply to beat him up. And since there's no evidence as to the details of what had happened in the woods, it cannot be concluded that you learned of the intent to kill in time to withdraw, which is what Rose Bond requires. Thank you. Thank you very much. There's a zero next to your name, sorry. So I want to thank all the lawyers in this case for their very able arguments this morning. You know, generally when we see four defense lawyers on one side of the table on an appeal, it doesn't work out well. But it did here, I think, because you all ably prepared and, I think, represented your clients in their very best interest. And so I want to thank all four of you. I'll come back to you in a second. I also want to thank the government, Mrs. Jarrell, for your able argument. I wanted to say a few words before we come down and read counsel about the state of affairs in our judiciary, and particularly the budget issues that have roiled the judiciary and defender services for some time. For those of you who don't know, over 90% of defendants in our criminal justice system are indigent, meaning that they can't afford to pay for the services of a lawyer. When that happens, the federal defenders, the very able federal defenders, represent roughly about 60% of the defendants who are in that position across the country. The other 40% are represented by lawyers like Mr. Wagner, Mrs. Erkin, and Ms. Moneta, who take these cases on as part of their practice and are paid by the federal government. Unfortunately, since July of this year, these lawyers have not been paid for their work. And given the current budget situation, which is, if you are all familiar with the recent news, is only getting worse and more dire, it's not clear to me when, if at all, any of these lawyers will be paid, which frankly is an abomination as far as I'm concerned. It's just a terrible situation in which to be in. And on top of that, if we have a government shutdown at the end of the month, which I suspect, unless there's some Hail Mary miracle that I don't see coming, then the US attorneys will not be paid. The federal defenders will not be paid. Judiciary staff will not be paid. And this is just a horrific situation in which we find ourselves. And of course, there are larger budgetary issues that the federal government is dealing with. So I would urge those of you in the audience to please speak with your representatives about this situation and let your voices be heard. We are doing all we can from our perch to try to remedy the situation. But it's just not clear to me that our voices are being heard. And our system can't work without lawyers who are willing to take on these cases, like these very able lawyers here today. Many of them are going to walk away from this work if they can't, that have no realistic opportunity of being paid. And that would be disastrous for our criminal justice system. So I want to thank all four of you for taking on this important work and being court appointed for this appeal and for ably representing the interests of your clients. And my hope is that at some point, you'll get paid. But more importantly, thank you, nonetheless, for doing it, even without the prospect of getting paid any time soon. We'll come down and greet the lawyers and then move on to our second case.
judges: Albert Diaz, Roger L. Gregory, Barbara Milano Keenan